Case number 20-4308 Melanie Lockhart versus Maria Marietta City Schools et al. Oral argument is not to exceed 15 minutes per side. Mr. Bean for the appellant. Good afternoon. Mr. Bean, I might have misread it. I think you reserved five minutes rebuttal. Is that right? That's correct. I was going to speak up and but I wanted to let the deputy finish. Sorry. Okay, you'll have your five minutes rebuttal. You may proceed. Thank you very much, your honors. May it please the court, Fred Bean, on behalf of the appellant. Your honors, obviously without diving into the facts, I do want to set the backdrop here. We're talking about an 18-year employee from Marietta City Schools, a teacher with no meaningful history of discipline that suffered from this one incident on January 13, 2018, and it resulted in her termination about four months later. This is a disability discrimination case, your honors, plain and simple, and there's really two issues, salient issues before the court. Number one, as it pertains to the disability discrimination case, the focus is on the pretext analysis. I'm not going to spend too much time talking about the prima facie case. There was only one element that was challenged by appellee with the district court, and that was the question of whether my client was disabled. Given the fact that their own physician determined that she was disabled and suffering from bipolar and the district court agreed with that analysis, we would agree that that was the proper analysis, and that's why the prima facie case has been met in this case, at least for purposes of summary judgment. That brings us only to the issue of pretext in terms of the disability discrimination claim. Now, as we know, as this court has held years ago in the Singfield versus Akron Metro matter, in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain. So we're only talking about a question of fact here, and I have to remind the court that we not lose sight of that, that we're only talking about a question of fact. So we have three theories of pretext. Can I take you back? I'm sorry. Can I take you back to the prima facie case? One of the elements is that your client had to be otherwise qualified for the position. Was she? Absolutely, your honor. The standard for qualification, well, I don't have a case directly in front of me on that issue since it wasn't challenged, is very minimal. Qualification is determined, can the person form the basic functions of the job throughout her tenure, she was qualified. Now, once we get into the argument of how the disability plays in and Dr. Lee's report, then the argument comes up about her fitness for the position, but that's where we get into the accommodation issue. But from the bare minimum of that actual prima facie element of qualification, I don't believe there's really any dispute there from the other side that she does meet that minimum qualification for that prima facie case. Well, don't they argue that in the context of pretext though? I mean, you're correct that they don't argue that she's not otherwise qualified in context of the prima facie case, but they do in the context of the pretext. And they say that their non-discriminatory reason, one of them is that she's incapable of doing the job, that she's not qualified to doing the job. So they do raise the issue. And how do you respond to that? Absolutely. They do raise that issue, your honor. It's one of their four points. And that stems from Dr. Lee's report. And what that factors into is what it also brings in the accommodation analysis. Because essentially what the employer did in this case, and we have to keep in mind the spirit of the ADA and what the spirit of the ADA is for to protect employees. What the employer essentially did is they conducted their own medical evaluation with their own medical physician, and then used it not as a shield for the employee like the ADA is intended, but as a sword, as a means to terminate Ms. Lockhart. So essentially they had this evaluation performed under the auspices that it was to help her. It was to determine whether or not she at the time met the qualifications of the job, or whether she had some type of impairment that was going to require some type of intervention or assistance for her. They determined the latter, but then they just didn't take the next step in following through and determining whether or not there was any accommodation or process that they could go through to help accommodate her. And they instead moved straight to using that as a means to terminate her. What are they supposed to do? I mean, I think both experts have come to the conclusion that she has bipolar disorder. But what accommodation did your client request to make her qualified to work with the bipolar disorder? Yes, your honor. That's where we get to the Maloney case. Well, the Maloney is a district court unpublished decision from the Eastern District of Michigan. And on the Sixth Circuit, that's not much precedent for us. I mean, do you have anything better than that? Well, no, I understand. I understand, your honor, that you specifically have addressed that decision in the Stanchell versus Donahoe case. But I think that, and to other than in that opinion where you touched on it, and you said that even if we can apply arguendo in that specific case, the appellant didn't meet the specific elements. In this case, she does meet those elements. And I think this is an opportunity for the Sixth Circuit Court of Appeals to revisit Maloney because Maloney does not stand alone. It's a case that builds upon several other circuit decisions, the Second Circuit decision in Brady, the Seventh Circuit district in Butler-Meyer, which stand for the same proposition of the ADA. We're not talking about state law here. We're talking about the ADA that applies across all jurisdictions. And the simple fact of the matter is, when it comes to that accommodation request, is that we have to apply that common sense approach, which is if the employer has reason to know about the disability, which in this unique case, under these unique facts, they certainly did. It was their own physician who determined this and uncovered this for their benefit. Once they know that, and once they have reason to believe that the condition is affecting or causing the issues at work, which Mr. Hampton and all of the Marietta witnesses testified, they believe that that was the case. That was the reason why they had the evaluation done in the first place, if you believe their testimony. And then at that point, the only determination left. You can see though that she didn't request an accommodation, right? I can see that she did not request an accommodation up until the date of April 5th, which technically still was prior to her termination. Obviously, the district court did not accept that argument and chose to apply quite the situation more to Yarberry, which we think is distinguishable for several reasons. Number one, because in Yarberry, there was no dispute over the underlying conduct. The person was on surveillance footage, committing all of the wrongs that were alleged. Whereas in this case, and bringing us back to the pretext, there is a genuine issue of dispute over every allegation that Marietta Schools put forward, other than maybe the one single instance where my client admitted months earlier that during the off months of the summer while at home in West Virginia, she used marijuana. Getting back to the reasonable accommodation, I mean, I don't know because it's really not on the record. But I just kind of assume that for bipolar disorder, the only thing they could do is probably medicate her. So are you saying that the employer, the schools should have ordered her as the accommodation? I mean, what do you want the schools to do? She never made a request. You say that under this district court decision, it's nevertheless the employer's responsibility to come up with an accommodation. So is the accommodation that you at least propose on appeal is that they medicate her or what? Not to go that far, your honor. In fact, you're sort of hitting on the argument that Marietta brought up, which is, hey, we can't force her to undergo medication. You can't, can you? Absolutely not. And that's not the argument here. The argument and what the ADA affords is opportunity for that person to get an accommodation. It's no different than any accommodation. If I need a stool at work, they have to give her an opportunity to get medicine or what? I mean, I assume she's got a drug plan or something. I mean, what specifically did they not do that they should have done? They did not give her time to get the treatment that she needed. All right. Did she ask for 60 days, 90 days to get medicated or something? I mean, did they turn down a request like that? No, they did not. Because once again, it goes back to the reason why Maloney is applicable to this case, your honor. Okay. Well, Maloney is not binding on us. And if you think it's good law, I guess you got to tell us why you think we adopt something like that. Absolutely. And for the same reasons that why it's been adopted in other circuits, because in this particular case, Ms. Lockhart, unique to this case, Ms. Lockhart had an experience that even today she considers to have a religious connotation, a deep religious experience. She was not in a position to appreciate, understand, or even fully comprehend her own disability, which is the very reason why this excuse for not specifically requesting the accommodation applies. The employer knew about the condition and sat idly by and knew that there were accommodations that were put in Dr. Lee's report that she could have used medication. She could have used time for more evaluation. And they did not even have that to then attempt to give her that time, which would have been very easily to do because she was already on administrative leave at the time. They simply could have told her, if I can just finish my point real quick, your honor, they could have simply given her the opportunity, whether it be 30 days, whether it be 60 days, a simple request, hey, this is what you need to do. Go see if you can get help. And if you can get cleared, we will bring you back. They did not afford her that key here. They did not engage in that discussion. So allowing her to fail and say, oh, well, we couldn't force her to get medicated. That's not the issue. The issue is they did not engage in their duty under the law to engage in that initial discussion. You say she first requested an accommodation on April 5th. How did that request come about? It came about at a board meeting. I believe by that point there was some legal counsel that she had involved, which I think that participated in it. And that's why we haven't come to this court and said, hey, that's good enough that she did on April 5th. But at a board meeting, she had made that request. She had it in a piece of writing that was submitted to the board. And then they, after meeting that, adopted her termination. Did she actually request an accommodation or did she complain that she wasn't given more process? I believe the exact words in her, not the exact, but the words in her writing were not specifically a specific accommodation. It was the fact that she had complained about that they hadn't engaged in the discussion to accommodate her without formally saying this is specifically what I'm asking for. And how long was that after the incident? The original incident occurred on January 13th. Her psychological evaluation occurred on February 22nd. And Dr. Lee's final report was issued on March 6th. It was seven days after that that gave her the pre-termination letter with these list of charges, all of which, once again, she disputes. And then obviously on April 5th was the board hearing confirming her termination. And then it went on for a while, right? It did go on after that because given her job at a public school, there were some administrative level appeals that she's entitled to under certain of the revised code. So even though she didn't request an accommodation, they should have just said, look, we think you need help. We're giving you X number of days and go think about it and then let us know. I mean, something like that. I mean, it's a mixture of things, Your Honor, because number one, they had received, they had already been told by Dr. Lee what she needed. So, I mean, one of our arguments is that in and of itself is a constructive form of an accommodation request because paperwork submitted by a physician can serve as an accommodation request, even if it doesn't come directly from the mouth of the employee. So they had that. And once we factor in this standard that we're asking the court to adopt in this case, it has been adopted across some other circuits. It makes sense in this case. It's come up in other cases in this circuit. And the only reason why I submit and believe that it hasn't gotten more footing is because those weren't the right cases. Those cases dealt with physical impairments or situations where it was, there wasn't an argument for the person to show that they were otherwise impaired from requesting an accommodation. This case is unique. It has the facts to support that standard, much like the case in Maloney and some of the other cases that have applied it on their circuits. Thank you. Thank you. All right. Any further questions at this time, Judge Raylor? I guess not. You'll have your five minutes rebuttal, Mr. Beam. All right. Let's hear from the counsel for the appellees. Thank you, Your Honor. May it please the court. My name is Craig City School District and William Hampton, and he is the superintendent. We're here urging the court to affirm the decision-graining summary judgment by the trial court below. Why wasn't he entitled to have some period, some accommodation, which would be some period of time to get well again? Well, Your Honor, in response to that, there was never a reasonable accommodation requested at any point in time, ever. I think that goes to Judge Griffin's question earlier. It was never requested. Secondly, there is no evidence in this matter that a reasonable accommodation is feasible out there under these circumstances. And again, opposing counsel suggests providing a not only the report of Dr. Lee in this matter, and Dr. Lee was asked to conduct an examination, make a recommendation, whether Ms. Lockhart was fit for the job of teaching school. And could she perform those within the ethical boundaries of the job and the legal boundaries of the job? In addition to that, Your Honor, she also, we found out during discovery, she saw her own psychologist. And again, these are not MDs or DOs. They are PhDs. They are counselors. They are not physicians. But she saw Amber Davis, MA, on her own. And we found out about that during the process, and we learned that the plaintiff, appellant, went to see Amber Davis, and certain suggestions were made, and she didn't follow through on a single one. It was suggested that there were things that she could have done, psychotherapy, perhaps pharmacological management, which would have to come in the form of an MD or a DO. And that was offered to her and suggested by her own psychologist, but never followed through. And to that point, to Judge Griffin's point, the Marietta School District doesn't have the ability to make her do any of these things or to provide them to her. We can't prescribe medicine or say you're going to do this. None of that is available for us to go into to make her do, and she chose time and again to do it. And I think that the biggest reason is she continues to strongly suggest she has no disability, that there is no problem, that this was a deeply, deeply religious event that happened to her, and her conduct has to be looked at. And I'll reference Yarbrough in this matter, and I find it interesting that the trial court indicated that Yarbrough was a closed case. This is not. And the very conduct that Melanie Lockhart took place or took part in and conducted in this matter goes back to, and again we're talking about burden shifting, prima facie showing, and then us coming, the defendants coming forth with an explanation of why the legitimate business reason was made for termination, and that kind of goes into the facts. And your honors, I know that you know the facts, but I think that this is a little bit somewhat isolated because we're dealing with the teacher who's dealing with 14-year-old students, and she again and again and again was talking about religious experience. God was inside me. God talked to me. God told me what to do. And she talked to some of these, and the record is very clear about this, that she talked to some of the students and said, he chose you, and he being her God or a God, chose me to talk to you. He was happy that you responded with questions. We're talking about a situation where parents send their children to school, just as my wife. I don't think anybody is arguing that she was fit to be a teacher right then. I mean, I feel that that doesn't seem to be the issue. The question is whether she was entitled to an accommodation consisting of time to get better. Judge White, I think we'd have a totally different situation if she came forward and said, I think I have some troubles. I think I have some bipolar problems. I'm trying to get some help. I need a reasonable accommodation. I need more time. I need to get care and treatment. That would be one thing, and that would be a totally different situation of what we've got. In this situation, your honor, we have the bad conduct complained of that has already happened, and Yardberry was very clear that we can't go back after the fact and say a reasonable accommodation wipes clear everything that has happened here. And again, when we're back to the specific factual pattern that we've got here, something as scary, and I don't use that word lightly, but something is scary as a teacher saying we're going to make national news. That is a very concerning matter to the point that the record is clear. Other teachers were worried about her being in the building. Other teachers wanted to make sure that locks were changed and punch codes were different, that this didn't happen. Calls were coming in from parents. We have, and I'm not going to beat it, but you know, the Washington County Sheriff went there to do a wellness check, that there were calls about Facebook postings, references. I mean, it's clear that people were concerned and, you know, accommodations, then there's no duty to accommodate. Well, I think that there would have to be, before there can be a duty to accommodate, there would have to be several necessary steps that just do not appear in our case. One is for the request for an accommodation or the problems being noticed before the bad behavior takes place, and I think the court, I think everybody here would acknowledge what she did factually is very problematic, and it's scary, and I don't think, I think that's beyond the argument here. But that was part of the illness, was it not? Well, I think that that's very, very questionable, but I think that the answer to that would be that whether it is part of the illness or not part of the illness, the fact that the conduct concerning, the conduct that did occur, and the conduct that is rise for the legitimate business reason to terminate her came before there's any argument that could ever be made that Marietta City School District knew or should have known that there was an alleged disability that was there, and it would have to have come before any of this conduct took place. Neither of those things exist in this matter whatsoever, and we go back to, and I think it was Judge Griffin's earliest question to Mr. Bean had to do with what is the school district supposed to do, and your honor, to your point, Judge White, to your point, she didn't come in and say, I really have a lot on my place, I need help, I need, I need medicine, I need things to be taken care of, and that way, none of that was ever, ever happened. Through the hearing with the Board of Education, through the hearing with district here, the hearing officer, David Hitt, who recommended termination, which was taken, she continued to manifest a belief that there was nothing that was there in any way or shape or form, and with that being the situation, there is nothing that Marietta City Schools has the ability to do under this given set of circumstances, and I think I'll liken this to the Yarberry case, because in Yarberry, we've got the employee, is employed by H.H. Gregg, and went in in the middle of night, broke into the store, and there's a surveillance video that sees aberrant behavior. After that happened, the person ended up going into a psychiatric unit to get care, to get taken care of, to try to overcome this, and there was talk about, well, this is a single incident, and it just happened in the framework of a couple of hours, and there were real problems there, and he's trying to get help. None of that was enough to get beyond the legitimate business reason for termination of that employee. Again, I apologize for repeating, Yarberry is a much tougher call than is this case, because your honor, Judge White, this occurred over a lengthy period of time and still continues to occur, and there, and again, we get into one of the legitimate business reasons after the shifting takes place, has to do with marijuana use. It wasn't a one-time marijuana use, it was a multiple-time marijuana use. Is that something that people are fired for? I'm sorry, you cut out at the beginning? Is that something that teachers are fired for? She would have to prove, in this case, that she was treated differently by any other teacher who that the district knew was utilizing marijuana and utilizing it to an impairment point, and that they were treated different, and there's a legitimate business reason for legal reasons. We're dealing with youth and the very optics of it all, and there is, in the record, your honor, there is not a single shred of evidence that she was treated differently than any other employee at any other time. There's not a single reference to any other Marietta City School District employee who was utilizing marijuana and was treated differently. That does not exist in the record, and for her to overcome that shifting burden, and again, say for a second that the plaintiff appellant met it with the prima facie case, and then the school district comes back with legitimate business reasons on why it undertook the action that it took under a very concerning set of facts that there would have to be a demonstration on that single issue that she was treated differently, and she was not. And the trial court found, and I urge this court to agree, that the school district has a legitimate business reason in terminating someone for the usage of marijuana and the public discussion about that very fact. And there are no rules you know, civil service rules or teacher rules where a violation has to be sent out within a specific period of time or anything like that? No, your honor, there's not. So with this situation, and you know, when we look at the legitimate business reasons, and I urge this court of superior jurisdiction to adopt the logic behind the finding of the trial court relative to what we have here with regard to the stated reasons for the legitimate and non-discriminatory termination of the plaintiff, and she was afforded her due process in every way, in every step along the way, and to that, that the disability-related conduct can never be, and I'm going to quote here from the Sullivan case, your honors, that it says, having a disability does not insulate an individual from adverse employment action. And I think that there is a certain importance as to the action that took place here, and the Marietta City School District has a legitimate business reason and has policies that prohibit teachers from sharing religious beliefs and engaging in inappropriate comments and communications with students. Here in this situation, we have one-on-one contact, we have a group of 23 to 25, 13 or 14-year-olds in the classroom, and we have follow-up email, and I guess to the question of was she entitled to a reasonable accommodation or should Marietta City Schools have done something, and I bring it back to the point that in this matter, she was specifically told when she was placed on paid admin leave that she was not to be on the school grounds, she was not to contact any of the other students to discuss any of the religious experiences or what had happened to her or the fact that he, i.e. God, was speaking to her and to them. She violated that, Your Honor, time and time and time again, and that goes back to the bad conduct that we're talking about here, that we've got an individual who not only has the singular time as the claimant that never got the job back in Yarbrough, but this is a multitude of determination, but by Amber Davis, seeing of her own choosing, and she chose to totally disregard anything at all that Amber Davis had to say as far as recommendations about things that she should do about falling through with pharmacological help or ongoing psychiatric intervention, and with that being the situation, I think that kind of goes back full circle. She got another job, right? I'm sorry? She started working for a different school district? She got part-time substitute teaching at a couple of local school districts in the northern West Virginia area. That started sometime, oh, my memory tells me it was about nine or ten months after this happened. So what does that, does that mean that maybe she was qualified to teach? Well, no, I don't think so. I think that that brings into question the greater question of whether there's any disability whatsoever, because we know for a fact she's had none of the care or treatment that the appellant would argue in their brief somehow becomes the responsibility of the appellant. And I see my timer is at zero, and if there are any questions, I'd be more than happy to do my best. Other than that, thank you very much for your time. Thank you. Any further questions, Judge White? Judge Raegler? All right. Thank you, counsel. Mr. Bean, you have five minutes for rebuttal. Thank you, your honor. So to address a few points, number one, going back real quick to the accommodation process, the confusion that keeps being put into this matter is akin to almost the cart before the horse analogy, your honors. And that is Marietta wants to just keep harping on feasibility. What would be feasible for us to do? And once again, it is not an excuse. There is no legal excuse, and Marietta cannot point to any law satisfying such an excuse to say we are not going to engage in the interactive process because we believe at the end of that process, the determination would be that there's no feasible accommodation. You can't skip the process and just skip right to the end and make your own. How do you know the other side even wants to engage in the process if they don't tell you that? Well, once again, your honor, it's not about necessarily the wanting of the process. It's about there's no requirement that the employer only engage at the time that the employee wants an accommodation. Once again, at the point I was trying to make earlier to Judge Griffin, an employee could refuse any accommodation. I mean, if you gave an employee a stool to sit on that they needed and the employee simply said, no, I'm not sitting on that stool. Well, now the employer has satisfied their duty. They've engaged in the process. They've given the accommodation. And if the employee ultimately refuses what's given to them, well, then that's their prerogative and the employer can take appropriate action. But you have to go through that process. And here she was already on leave. She was there was no undue hardship to simply give her the time with the mandate that, hey, we think you need help. So you need to go get help. And we're going to give you this amount of time to get clearance. And if not, then we're going to take action to declare that you're unfit. And we're going to and we're going to what what what time frame do you say the law requires that they had to give her 30 days, 60 days, 90 days? What what what did the law require as to the time frame? Well, Your Honor, I don't think the Sixth Circuit has ever determined a specific amount of time. There's the Sayers case, if I'm saying that correctly, C.H.E.R.S. versus Northeast Ohio, which is a Sixth Circuit case. Are we just supposed to make it up? Are we supposed to make up what the law is? I mean, no, but I think there's some discretion there to determine what is a reasonable leave of absence. The Sayers case determined that a medical leave of absence can be considered a reasonable accommodation. Now, they just didn't get into that case in terms of a hard term cutoff, whether it's 30 days, 60 days. I mean, because I can see you arguing that even here, if the school district gave her 30 days, you'd say what's a violation of her rights because she should have gotten 60 days. And if they gave her 60 days, I could see you say, well, I should have given her 90 days. And the school district is going to say, well, we don't know what the heck we're supposed to give her. She never she never asked for an amount. Sure. And I think if we were in that situation, if they had given her 30 days and I was here arguing for 60 days, I think Marietta would have a better argument because at that point they would have at least engaged in the process. I mean, doesn't that kind of show you that the employer has to request the accommodation so the employer can decide whether or not he's going to grant it or not, rather than the employer just making it up on his own and seeing if it's going to fly. In most cases, but not in this case. And that is why the EOC regulations and guidelines, I believe, your honor, use the word generally, because this is a situation. And in terms of these situations where you have mental and cognitive disabilities, there can be a successful argument of an impairment of a person's ability to request that accommodation. At that point, we go back to the reasoning that I think this court should listen to in Brady from the Second Circuit, where the court there said this is about using our common sense for the notice requirement. Well, it's about it's about it's about replacing a bright line rule, which is you have to request an accommodation that's that's very easily understood and puts the employer on notice with a rule that you want us to adopt, which is that the employers have to monitor all their employees. And they're on notice to constantly monitor all their employees. And if one of their employees has a significant enough condition, that even though the employee hasn't said that the employer has to assess that. And we and there's also these cases where employers wrongly view someone as having a disability when they actually don't, but you want all the employers to measure every employee and then decide, well, I think they've got to the point where they have an accommodation and they should have asked for it. And they haven't asked for it. The reason they must not have asked for is because they're so disabled, they can't ask for it. So now we need to grant them an accommodation. I just see a big problem with that standard. I think I think we can simplify it a little bit, Your Honor, though, that, you know, it is a case by case determination, because to afford and go by the spirit of the ADA. Once again, there are these situations in these cases where certain employees where the knowledge requirement, whether it comes directly from their mouth or not, the employer knows. And this is that case. This is that case where their own physician gave them all the knowledge that they needed and even the accommodation request from the doctor. And they just didn't do anything other than Terminator. All right. Thank you. Any further questions, Judge White? No, I don't. Thank you, Judge Raylor. All right. Thank you, Mr. Bain for your argument. The case is submitted.